Opinion for the Court filed by Circuit Judge GRIFFITH.
Opinion filed by Senior Circuit Judge EDWARDS, concurring in the judgment.
GRIFFITH, Circuit Judge:
The district court denied appellant’s petition for a writ of habeas corpus challenging his detention at Guantanamo Bay. We affirm the district court because its findings of fact were not clearly erroneous, and those facts support the conclusion that appellant was more likely than not a part of enemy forces at the time of his capture.
I
The background of this case is set forth in the district court’s thorough opinion, see Hussein v. Obama, 821 F.Supp.2d 67, 68-75 (D.D.C.2011), on which we rely to recite those facts relevant to this appeal. Appellant Abdul al Qader Ahmed Hussain[1] is a citizen of Yemen detained at the United States Naval Base at Guantanamo Bay. Sometime in 1999, Hussain left his home in Yemen for Pakistan. He initially spent a few weeks in Karachi and then traveled to Quetta, where he stayed for about three months. While in Quetta, he lived in a mosque run by the Jama’at al-Tablighi (JT) organization. From Quetta, Hussain traveled to Afghanistan, where he spent approximately three months. After that, Hussain returned again to a JT mosque in Quetta in April or May of 2000 until about June, when he left for Kabul, Afghanistan. In approximately August 2000, he returned once again to Quetta for another three-month stay at a JT mosque. Then, in November 2000, Hussain moved to Afghanistan and settled for ten months in an area north of Kabul that was ravaged by war between the Taliban and the Northern Alliance. Hussain lived near the front lines with three armed Taliban guards. Hussain’s Taliban housemates supplied him with an AK-47 rifle and trained him in its use. After al Qaeda attacked the United States on September 11, 2001, Hussain fled Afghanistan and returned to Pakistan where he lived at yet another JT mosque in Lahore. He was captured in Faisalabad in March 2002,[2] and was transferred to Guantanamo Bay soon thereafter.
Seeking to challenge his detention, Hus-sain filed a petition for a writ of habeas corpus with the district court on October 27, 2005. Uncertain of its jurisdiction to hear habeas petitions from detainees at Guantanamo Bay, the district court stayed the case in January 2006. In the wake of the Supreme Court’s decision in Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), the district court heard Hussain’s petition, but denied *967 him relief. The district court concluded that Hussain was part of al Qaeda or the Taliban at the time of his capture, based on evidence of what he did and with whom he stayed in Pakistan and Afghanistan as well as his efforts to explain away that evidence, which the court found implausible. See Hussein, 821 F.Supp.2d at 79. Hussain now appeals.
We review the district court’s factual findings for clear error. We review de novo the ultimate legal determination of whether those facts support detention. See Barhoumi v. Obama, 609 F.3d 416, 423 (D.C.Cir.2010) (“Determining whether a detainee was ‘part of an associated force is a mixed question of law and fact” because “whether a detainee’s alleged conduct ... justifies his detention under the AUMF is a legal question” and “whether the government has proven that conduct” is a factual one. (internal citations omitted)).
II
The Authorization for Use of Military Force (AUMF), enacted in response to the terrorist attacks of September 11, 2001, permits the President to detain individuals who “planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such ... persons.” Pub.L. No. 107-40, § 2(a), 115 Stat. 224 (2001); see Hamdi v. Rumsfeld, 542 U.S. 507, 519, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (stating that the AUMF “clearly and unmistakably authorized detention” of enemy combatants). As we have stated repeatedly, this authority justifies holding a detainee at Guantanamo if the government shows, by a preponderance of the evidence, that the detainee was part of al Qaeda, the Taliban, or associated forces at the time of his capture. See Khairkhwa v. Obama, 703 F.3d 547, 548 (D.C.Cir.2012); Uthman v. Obama, 637 F.3d 400, 403 (D.C.Cir.2011); Salahi v. Obama, 625 F.3d 745, 751-52 (D.C.Cir.2010); Bensayah v. Obama, 610 F.3d 718, 725 (D.C.Cir.2010); Awad v. Obama, 608 F.3d 1, 11-12 (D.C.Cir.2010); Al-Bihani v. Obama, 590 F.3d 866, 872 (D.C.Cir.2010).[3] Hussain challenges this standard on two grounds, which he acknowledges we have rejected before. Appellant Br. 15 n. 2. We do so again.
Hussain argues that the government must show that he was involved in the “command structure” of al Qaeda or the Taliban, rather than merely “part of’ these organizations. But “[njowhere in the AUMF is there a mention of command structure.” Awad, 608 F.3d at 11. While such a showing would be enough to sustain Hussain’s detention, it is not necessary. Id. We have long held that requiring proof that a detainee was part of the “command structure” is too demanding; the sweep of the Executive’s detention authority under the AUMF is broader. See Uthman, 637 F.3d at 403; see also Salahi 625 F.3d at 751-52 (quoting Bensayah, 610 F.3d at 725).
Hussain also argues that the government must show that he personally picked up arms and engaged in active hostilities against the United States. But *968 again, this argument demands more than the AUMF requires. See Khairkhwa, 703 F.3d at 550 (collecting cases that reject the notion that a detainee must have engaged in hostilities); Awad, 608 F.3d at 11 (Once the government demonstrated that the detainee was part of al Qaeda, “the requirements of the AUMF were satisfied.”); Al-Bihani, 590 F.3d at 869 (permitting the detention of a detainee who “worked as the [55th Arab Bjrigade’s cook and carried a brigade-issued weapon, but never fired it in combat”). As we noted in Khairkhwa, permitting detention only for those detainees who engaged in active hostilities would be inconsistent with the realities of “modern warfare” in which “commanding officers rarely engage in hand-to-hand combat; supporting troops behind the front lines do not confront enemy combatants face to face; supply-line forces, critical to military operations, may never encounter their opposition.” Khairkhwa, 703 F.3d at 550. Nothing has changed since we rejected these arguments only months ago. We are bound by our precedent and therefore reject Hussain’s challenges. Having done so, we offer a brief overview of how we evaluate evidence in these eases.
We have adopted no categorical rules to determine whether a detainee is “part of’ an enemy group. Instead, we look at the facts and circumstances in each case. See Bensayah, 610 F.3d at 725 (“It is impossible to provide an exhaustive list of criteria for determining whether an individual is ‘part of al Qaeda.”). We look at each piece of evidence “in connection with all the other evidence” in the record, and not in isolation. Almerfedi v. Obama, 654 F.3d 1, 4 (D.C.Cir.2011); see also Sal-ahi v. Obama, 625 F.3d at 753 (“Merely because a particular piece of evidence is insufficient, standing alone ... does not mean that the evidence may be tossed aside.... The evidence must be considered in its entirety in determining whether the government has satisfied its burden of proof.” (internal citation and quotation marks omitted)). The facts the district court found and the inferences the district court drew from them support the conclusion that Hussain was a part of al Qaeda or the Taliban when he was captured.
Ill
Perhaps the most damning evidence supporting the district court’s conclusion that Hussain was part of an enemy force when he was captured is his ten-month stay near the front lines of battle in war-torn Afghanistan. Hussain does not contest that he lived near the battlefront with Taliban warriors who gave him an AK-47 and taught him how to use it. Evidence that Hussain carried an assault rifle given him by Taliban forces while living among Taliban forces near a battle line fought over by Taliban forces brings to mind the common sense view in the infamous duck test. See, e.g., Dole v. Williams Enterprises, Inc., 876 F.2d 186, 188 n. 2 (D.C.Cir.1989) (adopting the “now-infamous ‘duck-test,’ dressed up in appropriate judicial garb: WHEREAS it looks like a duck, and WHEREAS it walks like a duck, and WHEREAS it quacks like a duck, WE THEREFORE HOLD that it is a duck.’ ”).[4] Evidence that Hussain bore a *969 weapon of war while living side-by-side with enemy forces on the front lines of a battlefield at least invites — and may very well compel — the conclusion that he was loyal to those forces. We have repeatedly affirmed the propriety of this commonsense inference. Alsabri v. Obama, 684 F.3d 1298, 1306 (D.C.Cir.2012) (“[I]t is difficult to believe that Taliban fighters would allow an individual to infiltrate their posts near a battle zone unless that person was understood to be a part of the Taliban.” (internal quotation marks omitted)); see also Suleiman v. Obama, 670 F.3d 1311, 1313-14 (D.C.Cir.2012); Al-Madhwani v. Obama, 642 F.3d 1071, 1075 (D.C.Cir.2011). Hussain suggests a more benign inference. He argues that his Taliban housemates gave him the AK-47 for protection from wild animals and thieves, and that they were not living all that close to the lines of battle anyway. But the district court permissibly rejected this version of the uncontested facts in favor of the government’s far more plausible explanation. See Hussein, 821 F.Supp.2d at 78. That finding was not clear error.[5]
Although the parties disagree about precisely when Hussain finally left Afghanistan, there is no dispute that he had left his Taliban housemates near the battlefront, returned to Kabul by September 11, 2001, and fled to Pakistan thereafter. The district court found Hussain’s story of his movements after he left Kabul unbelievable. He claimed, somewhat inconsistently, that he left Afghanistan both to return to Yemen to be with his family and possibly to marry, and to live in Pakistan to study, either computers or the Koran. But the record lends no support to either story. Once he left Afghanistan, Hussain stayed in Pakistan until his capture, and although he moved from Lahore to Faisalabad, he made no effort to return to Yemen or to attend any school. We agree with the district court that “all of the petitioner’s explanations seem to be little more than post hac [sic] attempts to present goals that change as necessary to support his presence in one part of the world or another. The sum of the petitioner’s inexplicable explanations for his actions renders his testimony completely incredible.” Id. at 79. That finding was not clear error and, under our precedent, provides evidence of Hussain’s continued affiliation with enemy forces after leaving Afghanistan. In other detainee cases, we have found that false cover stories, like those spun by Hussain, “are evidence — often strong evidence — of guilt.” Al-Adahi v. Obama, 613 F.3d 1102, 1107 (D.C.Cir.2010); see Uthman, 637 F.3d at 407. In Almerfedi we stated that “ ‘false exculpatory statements’ amount to evidence in favor of the government.” Almerfedi 654 F.3d at 7 (quoting Ah-Adahi 613 F.3d at 1107) (emphasis added).
The district court also relied on Hus-sain’s “extended stays at two Jama’at al-Tablighi mosques.” Hussein, 821 F.Supp.2d at 77. As we have already recited, on two separate occasions, Hussain lived at a JT mosque in Pakistan for about three months. As we noted in Almerfedi JT is “an Islamic missionary organization that is a Terrorist Support Entity closely *970 aligned with al Qaeda.” Almerfedi, 654 F.3d at 6 (internal quotation marks omitted). Although evidence of association with the JT mosques alone “presumably would not be sufficient to carry the government’s burden because there are surely some persons associated with Jama’at Ta-blighi who are not affiliated with al-Qae-da,” we held in Almerfedi that extended affiliation with the group over time “is probative.” Id. The district court concluded that Hussain’s multiple stays at JT mosques between his sojourns to Afghanistan suggests an affiliation with al Qaeda. Because Almerfedi plainly permits such an inference, we see no error in the district court having drawn it.[6]
Hussain faults the district court for holding that any contact with the JT organization suggests an affiliation with al Qaeda. But Hussain misstates the district court’s analysis. As we have just shown, the district court did not rely on such a categorical rule, but engaged in the type of fact-specific inquiry we require to reach its conclusion that Hussain’s repeated and extended stays at JT mosques suggest an affiliation with al Qaeda. See Bensayah, 610 F.3d at 725.[7]
Having been “part of’ enemy forces while living in northern Afghanistan at least through August 2001, Hussain makes no argument that he affirmatively cut those ties before his capture only six months later. And there is no evidence to suggest that leaving his Taliban housemates in Afghanistan marked a turning point from Hussain’s old ways and an end to his connection with enemy forces. Nothing in the record shows the type of concrete, affirmative steps to dissociate that we look to when those once part of an enemy group claim they have left. See Alsabri, 684 F.3d at 1307 (noting that the detainee “proffers no evidence that he took steps to dissociate himself from those groups in the months between his departure from the battle lines and his capture”); Al-Adahi, 613 F.3d at 1109 (noting that “there was no evidence that [the detainee] ever affirmatively disassociated himself from al-Qaida,” even when he was expelled from the group). In fact, the evidence points the other way. After living for ten months at the battlefront in Afghanistan with Taliban guards who armed him, Hussain fled to Pakistan, where he remained until his capture shortly thereafter, and, when asked to explain his actions in the interim, Hussain lied to the court. See Almerfedi, 654 F.3d at 7 (“ ‘[F]alse exculpatory statements’ amount to evidence in favor of the government.” (quoting Al-Adahi, 613 F.3d at 1107)).
Finally, Hussain argues that the district court erred by failing to determine whether he affiliated with al Qaeda, the Taliban, or both. Both are enemy forces, and affiliation with either justifies detention. See Al Alwi v. Obama, 653 F.3d 11, 18 (D.C.Cir.2011) (affirming the district court’s denial of the writ where it was clear that petitioner was “ ‘part’ of the Taliban or al Qaeda” (emphasis added)). *971 In any event, membership in these two groups sometimes overlaps, for example, when Taliban forces bring Arabic-speaking al Qaeda-affiliated members into their ranks. See Al-Bihani, 590 F.3d at 872 (noting that the 55th Arab Brigade was “an Al Qaeda-affiliated outfit ... [fighting] alongside the Taliban while the Taliban was harboring Al Qaeda”). The government’s evidence fits this pattern. Hussain associated with Taliban guards in Afghanistan and an al Qaeda-affiliated group in Pakistan. In sum, there was no error in the district court’s failure to distinguish between when Hussain was a part of al Qaeda and when he was a part of the Taliban.
IV
For the foregoing reasons, we affirm the district court’s denial of Hussain’s petition for a writ of habeas corpus.

So ordered.

. The district court spelled petitioner’s name ''Hussein.” We use ''Hussain,” the spelling employed by both parties on appeal.

. The district court incorrectly refers to "May 23, 2002,” as the date of Hussain’s capture. But on appeal, Hussain acknowledges that he was captured in "March 2002” after being in Pakistan for "approximately six months.”

. Our concurring colleague takes issue with our extensive precedent in detainee habeas appeals, arguing that we have not always kept to the preponderance of the evidence standard we have thus far invoked. But he is mistaken to say that we have “required” the standard. Post, at 971 (Edwards, J., concurring). In Al-Adahi we wrote that although the standard is “constitutionally permissible ... we have yet to decide whether [it] is required.” Al-Adahi v. Obama, 613 F.3d 1102, 1103 (D.C.Cir.2010) (citation omitted). Furthermore, nothing about this case requires us to settle the question because the preponderance standard is easily met here. This case is a fastball down the middle, not a curveball low and away. It is well within the strike zone.

. Our concurring colleague thinks such an inference is “quite invidious because, arguably, any young, Muslim man traveling in areas in which terrorists are known to operate would pass the 'duck test.’ ” Post, at 972 (Edwards, J., concurring). But the objectionable profiling our colleague fears played no part in the conclusion of the district court and is nowhere present in our reasoning. The district court cared not a whit whether Hus-sain is Muslim (or not). Neither do we. The innocent wayfaring teenager our colleague invokes bears no resemblance to Hussain, who was not simply in the wrong place at the wrong time. He was in the wrong place, at the wrong time, with the wrong people, doing the wrong things. Our precedent, to say *969 nothing of common sense, supports the inference that the district court drew and which we affirm.

. The concurrence attempts to downplay Hus-sain’s possession of the weapon. This misconstrues the district court’s legal reasoning. Mere possession of the weapon — or carrying it around — was not the critical point. The district court's conclusion that Hussain was loyal to enemy forces turned on the fact that Taliban soldiers gave him an AK-47 while he lived among them near the battle lines. Under our precedent, that alone demonstrates loyalty to a shared cause, even if Hussain never brandished the weapon in combat. Al-Bihani, 590 F.3d at 869.

. Hussain stayed at JT mosques for two other, shorter, periods. Although these short stays may not in and of themselves establish an affiliation with al Qaeda, repeated visits to JT mosques, coupled with his extended stays there, support the inference that Hussain was affiliated with the terrorist group.

. The government declared in the district court that it would not seek to prove Hus-sain’s formal affiliation with JT. Red. Br. Addendum at 17. And the district court did not rely on any formal affiliation between Hus-sain and JT. It concluded only that his repeated stays at the JT mosques, irrespective of any formal affiliation, suggest that Hussain was "part of” al Qaeda. As this inference does not rest on a formal affiliation between Hussain and JT, the government’s declaration below is simply irrelevant. Moreover, it was made before Almerfedi explained the significance of those stays.